UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No.: 25-cr-52-SE |
| | ) | |
| | ) | |
| ERIK X. ALONSO | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The defendant is now a twice-convicted health care fraudster who continued causing claims to be submitted to New Hampshire Medicaid, despite knowing that he was excluded and that he was treating Medicaid recipients. In spite of repeated notice of his exclusion from federal health care programs, the defendant continued working as a psychotherapist for a New Hampshire-based telehealth therapy practice (Clinic 1) which he knew accepted Medicaid and he continued treating patients, whom he knew to be receiving Medicaid benefits. The defendant also used sessions with a New Hampshire Medicaid patient, which were billed to New Hampshire Medicaid, to request the patient's help with the defendant's applications for licensure in other states and a presidential pardon. Because of the defendant's recidivism and blatant disregard for the exclusion process and its purpose, the government is requesting a sentence of 21 months' imprisonment.

For the reasons articulated below, the government respectfully requests that the Court adopt the findings of the PSR. Based upon the calculated Offense Level and Criminal History Category, the defendant's guideline range is 21-27 months. The government submits that a sentence at the low-end of the guidelines, 21 months imprisonment, followed by three years of

supervised release, is sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and both general and specific deterrence.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. Procedural History

The defendant was charged by indictment on June 11, 2025, with eight counts of health care fraud in violation of 18 U.S.C. § 1347. On October 23, 2025, the defendant entered a plea of guilty to count 7 of the indictment. Sentencing is scheduled for January 28, 2026.

### B. Offense Conduct

The defendant, a psychotherapist, holds a Master's degree in Social Work and a Masters and Doctoral degree in psychology. PSR ¶ 62. On October 14, 2015, the defendant pleaded guilty in the United States District Court for the Southern District of Florida (Miami Division) to conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and making false statements relating to health care matters, in violation of 18 U.S.C. § 371. As part of the factual basis for the defendant's plea, the defendant agreed that, for approximately 33 months, he worked as the clinical director at a number of community mental health centers in Miami-Dade County, Florida, which purported to provide partial hospitalization program services to individuals with mental illness. During his time as the clinical director, the defendant supervised other therapists and oversaw the fabrication of patient records, including group therapy sessions. The defendant was also aware that co-conspirators paid bribes and kickbacks to patient recruiters in exchange for recruiting patients to the clinics. Additionally, the defendant himself endorsed a check (approximately $4,000) which funds constituted proceeds of the fraud. The defendant's plea agreement, which he signed on October 19, 2015, stated that he understood that as a result of the plea he would "be excluded from Medicare, Medicaid, and all Federal health care

programs." The plea agreement did not express a time frame or time limit on the exclusion. On December 17, 2015, the defendant was sentenced. At sentencing, during a conversation between the sentencing judge, defense counsel, and the prosecutor regarding the defendant's ability to get his license back, the judge stated, "But perhaps there should be a restriction on his ability to bill Medicare or Medicaid or any other Government health program." The prosecutor stated, in response, "Yes, Your Honor. The plea agreement, paragraph 5 in particular, says the defendant will be excluded from Medicare, Medicaid and other federal programs…"

On September 6, 2017, the United States Department of Health and Human Services Office of the Inspector General ("HHS-OIG") sent the defendant a letter at FCI Jesup, where the defendant was serving the custodial portion of his SDFL sentence. The letter informed the defendant of his impeding exclusion and gave him 30 days to submit information regarding a waiver. Notably, the street address on the letter was incorrect in that it reads "1680 301 South" when it should have read "2680 301 South". Still, the address also included "Jesup FCI" and was not returned to HHS-OIG as undeliverable. The letter address also included a number consistent with an inmate number for the defendant.

On November 30, 2017, HHS-OIG sent another letter to the defendant at FCI Jesup, bearing the same numerical typographical error, but also including "Jesup FCI", in which it informed him that he had been excluded for a 42-year period. Similarly, this letter was never returned to HHS-OIG as undeliverable.

In March of 2022, the defendant began working at Clinic 1, a New Hampshire based telehealth mental health provider. As part of his employment, the defendant executed a Contract Provider Work Agreement with Clinic 1 which read, in part, "Contract Provider agrees and

understands that said compensation is based on reimbursement from insurance payers per CPT codes."

On August 23, 2023, the defendant emailed a HHS-OIG staff member via the email address exclusions@oig.hhs.gov and thanked them for considering his request for reinstatement. On August 29, 2023, an HHS-OIG employee responded, telling the defendant that his exclusion became effective on December 20, 2017, for a period of 42 years and that he was not eligible for reinstatement at that time.

Over the course of his employment with Clinic 1, from March of 2022 until July of 2024, the defendant routinely and repeatedly caused claims to be submitted to New Hampshire Medicaid. He did this despite knowing that Clinic 1 accepted Medicaid and treated Medicaid patients and specifically knowing that some of his patients were Medicaid recipients. Additionally, the defendant used sessions that were ultimately billed to New Hampshire Medicaid to discuss a patient helping him with licensure applications and an application for a presidential pardon.

### C. The Defendant's Objection to the Abuse of Trust/Special Skill Enhancement Included in the PSR is Without Merit

The government anticipates that the defendant will make several objections to the PSR. As a threshold matter, the majority of the defendant's anticipated objections have no bearing on the total offense level, with the exception of the Abuse of Trust/Special Skill enhancement. Regardless, all of the defendant's anticipated objections are without merit.

Consistent with the calculations set forth in the PSR, the government submits that the total offense level for the defendant should be calculated as Level 15 pursuant to U.S.S.G. §§ 2B1.1 and 2B1.1(b)(1)(F).

The defendant objects to the inclusion of the Abuse of Position of Trust or Use of a Special Skill enhancement, pursuant to U.S.S.G. § 3B1.3, on a number of bases, including that the defendant was unlicensed, that New Hampshire Medicaid is the victim, and that Clinic 1 should have screened the defendant for his presence on the HHS-OIG exclusion list.

Notwithstanding those claims, the defendant undoubtedly only had the ability to commit this crime due to his possession of a special skill, specifically advanced education and training in providing psychotherapy. "A 'special skill' as envisioned by § 3B1.3, is an expertise not possessed by members of the general public, usually requiring substantial education, training, or licensing." *United States v. Lee*, 324 F.Supp. 2d 165, 168 (D. Maine, June 4, 2004). That the defendant was unlicensed as a result of his 2015 conviction, and later, conditionally licensed, does not shield him from this enhancement. In *United States v. Valdes*, the Eleventh Circuit upheld the application of the special skill enhancement against a defendant who was trained as a doctor in Cuba, but unlicensed as a physician in the United States. The court explained that because "[t]he undisputed facts show that [defendant] used his skills as a trained doctor, whether licensed or not, to facilitate his fraud by submitting false medical claims," the special skills enhancement was appropriate. 2023 U.S. App. LEXIS 33606, 9 (11th Cir. 2023). Here, although unlicensed, the defendant likely would not have been hired by Clinic 1 absent his educational degrees and extensive experience and training in providing psychotherapy and other counseling services, and he would not have been able to meet with or provide the purported therapy to patients that triggered the submission of claims to New Hampshire Medicaid. The defendant used a special skill to perpetrate his crime and the enhancement under U.S.S.G. § 3B1.3 is appropriately applied.

## II. ANALYSIS OF THE SECTION 3553(a) FACTORS

The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress. *See* 18 U.S.C. § 3553; *United States v. Booker*, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." *United States v. Cheveres-Morales*, 83 F.4th 34, 43 (1st Cir. 2023).

"[T]he sentencing inquiry – once the court has duly calculated the GSR – ideally is broad, open-ended, and significantly discretionary." *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008). "Of overarching importance in sentencing is that a sentencing court must always conduct an 'individualized assessment' of the § 3553(a) factors – which include mitigating characteristics of the offender, based on the facts presented in one particular sentencing case." *United States v. Colón-Cordero,* 91 F. 4th 41, 51 (1st Cir. 2024). "How to weigh the § 3553(a) factors falls inside a sentencing court's informed discretion." *Id*. (cleaned up).

Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties. *Cheveres-Morales* 83 F. 4th at 43. These factors include, among others: (a) the nature and circumstances of a defendant's offense and his history and characteristics; and (b) the need for the sentence contemplated to, among others things: (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment

for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of the defendant.

The Section 3553(a) factors support a sentence of 21 months in custody for the defendant. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a), discussed further below.

### A. Nature and Circumstance of the Offense

New Hampshire Medicaid relies on health care providers to be honest, so that it does not expend its limited funds paying for unlawful claims. The defendant took advantage of that trust-based system in order to continue seeing patients and causing claims to be submitted for those patient sessions. By continuing to work for Clinic 1 and treat patients there, the defendant gained access to a steady and consistent source of income. He not only took advantage of the Medicaid system, but also took advantage of the vulnerable patient population that Clinic 1 served. The defendant utilized his patient J.C., for administrative assistance and discussed his application process for state licensure and a presidential pardon before discharging her and having her help him with that paperwork and other tasks. The defendant not only ignored repeated notices of his exclusion but also failed to raise the issue or cease practicing when he was repeatedly put on notice that Clinic 1 accepted Medicaid and that the patients he was treating were Medicaid recipients. That this conduct comes on the heals of a conviction for health care fraud of another ilk is especially concerning. Despite repeated notices of exclusion (the 2015 plea agreement, the sentencing hearing, letters sent to him at FCI Jesup[1], phone and email contact with a HHS-OIG

---

[1] The government anticipates that the defendant will take the position that he received neither letter sent to him at FCI Jesup due to the typographical error in the number of the street address. This argument is undercut by two compelling pieces of information. First, neither letter was ever returned to HHS-OIG as undeliverable. Second, the letter clearly indicated that it was intended for FCI Jesup. Despite the typographical error in the numerical street address, the facility the mail was intended for was clearly designated.

exclusion employee in August of 2023), the defendant continued treating New Hampshire Medicaid patients and took no steps to notify his employer or rectify the situation.

The government anticipates that the defendant will now attempts to shift blame to Clinic 1's owner, Individual 1, ignoring both the evidence and the ultimate issue—the defendant knew that he was excluded and took no action to stop treating Medicaid patients and/or to have Clinic 1 stop submitting claims to New Hampshire Medicaid for treatment purportedly provided by the defendant. For example, on August 23, 2023, J.C. texted the defendant a link to the HHS-OIG exclusion website. After some additional texting, J.C. wrote, "I would NOT recommend bring [sic] THIS up to either [Individual 1] or [S.R.]." The defendant responded, "Of course not. I didn't know it existed." Then later, in the same conversation, the defendant wrote, regarding Individual 1 and S.R.'s knowledge, "Actually, I don't know if they know this. I didn't even know this existed." That is to say, when confronted with the precise issue of exclusion, and despite having been criminally punished for fraud committed on a federal health care program in the past, the defendant chose to continue concealing his exclusion from his employer and allowing Medicaid to pay. To the extent that the defendant argues that other people—Individual 1, S.R., and the New Hampshire state licensing board—were aware of his exclusion but ignored it, that claims is undermined by the defendant's contemporaneous statement.

In addition to his knowledge of his exclusion, the defendant was both aware that Clinic 1 accepted New Hampshire Medicaid and that he had patients who were New Hampshire Medicaid recipients. Individual 1 told investigators that he frequently discussed Medicaid during routine staff meetings the defendant attended, both in the context of discussing the results of Medicaid audits and complaining about Medicaid's low reimbursement rate and the high needs of many of its recipients. These types of comments were confirmed by S.R., Clinic 1's Clinical Director and

the defendant's supervisor for some of the employment period, when he spoke with investigators. Individual 1 also emailed Clinic 1's staff on numerous occasions regarding the results of Medicaid audits, and the defendant responded to these emails.

Beyond general knowledge of Clinic 1 accepting Medicaid, the defendant had specific knowledge as to a number of his patients being Medicaid recipients. J.C. told investigators that, after the defendant made a disparaging remark about Medicaid recipients, she informed him that she and her children (T.C. and G.C.), whom the defendant also purportedly treated, were Medicaid recipients. Her statement is corroborated by a text message sent by the defendant to J.C. in December of 2023, in which he wrote: "By the way, I meant to tell you and I forgot. I too was on Medicaid when I was released from prison, I had it for 1 year." The defendant continued treating J.C.'s children, T.C. and G.C., after this text message was sent. Another patient's mother told investigators that she spoke with the defendant and told him that her child, B.M., was a Medicaid recipient. G.R.'s mother emailed with the defendant in which she explicitly stated, "[G.R.] has Medicaid to pay for these appointments." The defendant went on to forward G.R.'s mother's emails to Clinic 1's front desk manager and wrote, "This unfortunately happens a lot with Medicaid." PSR ¶ 19. Despite affirmative knowledge of Clinic 1 accepting Medicaid and that he was treating patients who were Medicaid recipients, however, the defendant did not stop treating these patients because of their Medicaid status and did not share his exclusion status with any staff at Clinic 1.

### B. History and Characteristics of the Defendant

The defendant is a convicted felon. More specifically, he is a convicted health care fraudster who was sentenced to 60 months imprisonment (later reduced to 40 months) for his role in a $64 million scheme targeting Medicare. Despite this, the defendant ignored repeated

9

notice of the fact that he was excluded from federal health care programs and that he was treating Medicaid recipients and thus causing claims to be submitted to New Hampshire Medicaid for sessions purportedly conducted by him. Indeed, the defendant's causation of the submission of claims to New Hampshire Medicaid only came to light when a complaint involving other activity of the defendant and J.C. came to the attention of state licensing authorities. This was not an incident of self-reporting; rather, the defendant kept his head down and continued violating the law whilst hoping that no one would notice.

Unlike many defendants who come before this Court and others, the defendant had the training and education to gain legitimate employment without running afoul of the confines of his sentence and its consequences. Instead, the defendant made the repeated choice to cause Clinic 1 to submit claims to New Hampshire Medicaid when he knew he was excluded, knew that Clinic 1 accepted Medicaid, and knew that he was personally treating patients who were Medicaid recipients.

### C. Deterrence, Promoting Respect for the Law, and Punishing the Defendant for His Crimes

A guideline sentence of 21 months is appropriate for the seriousness of the defendant's criminal conduct and his recidivism and justly punishes him for his conduct and criminal history. *See* 18 U.S.C. § 3553(a)(2)(A). It will also deter others from ignoring the exclusion list and continuing to victimize federal health care programs which have already taken steps to bar certain individuals from participation. 18 U.S.C. § 3553(a)(2)(B) (requiring district court judges to impose a sentence that affords adequate deterrence, both specific and general). "General deterrence is about preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant." *United States v. Politano*, 522 F.3d 69, 74 (1st Cir. 2008). As stated by the drafters of 18 U.S.C. § 3553(a), general

deterrence is particularly important for white collar criminals to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business." S. Rep. No. 98-225, at 76, 1884 U.S.C.C.A.N. 3182, 3259 (discussing white collar crime). HHS-OIG's excluded provider list includes a large number of individuals who have been excluded from federal health care programs for a variety of reasons, including, like the defendant, for health care related criminal convictions. The requested sentence will serve to put all individuals on that list on notice that running afoul of that exclusion carries significant consequences. As the Eleventh Circuit has explained, "[W]hen the government obtains a conviction in a health care fraud prosecution, one of the primary objectives of the sentence is to send a message to other health care providers that billing fraud is a serious crime that carries with it a correspondingly serious punishment." *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013) (finding sentence of probation substantively unreasonable); *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (noting white collar criminals are "prime candidates for general deterrence").

The requested sentence is also necessary to ensure that the defendant is specifically deterred from engaging in further criminal conduct. Despite his previous health care-related convictions, the defendant sought out employment as a psychotherapist, concealed his exclusion status, and then continued to conceal his exclusion status once he had uncontroverted information that Clinic 1 accepted Medicaid and that he was personally treating Medicaid patients. Various statements made by the defendant, including statements to the state licensing board and statements made to agents following his arrest in this case, demonstrate a minimization of his prior conduct – namely, that he just failed to report fraud. That is not what he was convicted of. Here too, in statements made to investigators following his arrest, the defendant's immediate reaction was to blame others, saying Individual 1 and the state board

11

knew he was excluded. A custodial sentence is necessary to ensure that the defendant understands that the law and the HHS-OIG exclusion list, on which he will continue to be listed, apply to him as an individual. The defendant is responsible for his conduct – no one else – and a custodial sentence will aid in delivering that message.

### D. Avoiding Unwarranted Sentencing Disparities

One of the central reasons for creating the sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014). Defendants situated similarly to the defendant, namely those on the HHS-OIG exclusion list, as well as the defendant himself, in light of his recidivism, need to be deterred from victimizing federal health care programs going forward. To avoid unwarranted sentencing disparities among defendants, as contemplated in 18 U.S.C. § 3553(a)(6), the defendant should be sentenced to a period of incarceration. Other excluded individuals and providers who were subsequently convicted of federal health care crimes during their exclusion period have been sentenced to substantial periods of incarceration:

- In *United States v. Imran Shams*, [2:22-cr-154 (C.D. Cal)], the defendant, who had twice previously been convicted of health care-related fraud and was excluded by HHS-OIG, pleaded guilty to conspiracy to commit health care fraud and concealment of his exclusion from Medicare after operating a clinical testing laboratory that billed Medicare and other federal health care programs ($234 million billed/$31.7 million paid). Shams was sentenced to ten years' imprisonment.

- In *United States v. Paul Emordi*, [3:16-cr-240 (N.D. TX)], the defendant, an excluded individual, owned and operated a Medicare and Medicaid provider, along with another excluded provider, in Garland, Texas ($3.5 million in restitution ordered). Emordi was sentenced to 60 months' imprisonment following a trial conviction for conspiracy to commit health care fraud.

The government recognizes that every case is different and the specific facts and circumstances of each defendant should be evaluated in reaching a sentencing determination. The government includes these case comparisons, however, to demonstrate that other defendants, similarly situated to the defendant in terms of their choice to ignore the consequences of their exclusion, have been sentenced to periods of incarceration. Accordingly, based upon all of the above, a sentence of 21 months' incarceration would be appropriate based on the Sentencing Guidelines and the factors articulated in 18 U.S.C. § 3553(a).

**V. Supervision Conditions**

The government requests a three-year term of supervised release following any period of incarceration for this offense. *See* 18 U.S.C. § 3583(b)(2). The government also respectfully requests that the defendant be barred from applying for any new licenses as a therapist, psychotherapist, or social workers and that he be prohibited from working in any medical or counseling setting during the term of supervision.

**VI. Conclusion**

For the foregoing reasons, the government respectfully submits that a Guidelines sentence would satisfy the directives of 18 U.S.C. § 3553(a). The government respectfully recommends that this Court sentence the defendant to a term of imprisonment of 21 months, followed by three years of supervised release, order a special assessment of $100, and order that

restitution in the amount of $173,998.83 be paid to the United States Department of Health and Human Services.

                                                           Respectfully submitted,

ERIN CREEGAN
United States Attorney

LORINDA LARYEA
Chief, Fraud Section
Criminal Division
United States Department of Justice

Dated: January 16, 2026                  /s/ Danielle H. Sakowski
                                               Danielle H. Sakowski
                                               Thomas D. Campbell
                                               John W. Howard
                                               Trial Attorneys
                                               Matthew Vicinanzo
                                               Assistant United States Attorney
                                               MA Bar # 684865
                                               Danielle.sakowski@usdoj.gov